UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ABMK PROPERTY 6332, LLC,

      Plaintiff,

v.

CENTRAL MUTUAL INSURANCE
COMPANY,

      Defendant.

Case No. 21-11488
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [31], AND DISMISSING AS MOOT
DEFENDANT'S MOTIONS IN LIMINE [30, 32] AND MOTION TO
STRIKE [48]**

---

Just after Memorial Day in 2019, Fred Kandah learned that the roof of his commercial building had partially collapsed. No one was around to see what happened—or when exactly—but Kandah assumed stormy weather that holiday weekend was to blame. So he filed an insurance claim, citing severe winds as the most likely cause of damage, and an independent adjuster was sent to inspect the roof.

The adjuster found no signs of wind damage. Instead, he saw evidence that prolonged water seepage into the roof's wooden structures had caused rot, decay, and deterioration. Heavy rainfall, the adjuster concluded, was the nail in the coffin. Kandah's long-time roofer, who had been patching leaks in the roof semi-annually for four years, largely agreed. He still believed that wind lifted the roof membrane and let rainwater inside. But he echoed that the roof was in poor condition for a long time.

And now that the roof's interior was visible at the site of the collapse, he observed that repeated water infiltration had indeed weakened the roof structure.

So Defendant Central Mutual Insurance Company denied coverage based on policy exclusions for, among other things, continuous or repeated water seepage, wear and tear, decay or deterioration, and collapse. ABMK Property 6332, LLC—Kandah's company—filed suit for breach of contract. (ECF No. 4.) Central now moves for summary judgment. (ECF No. 31.) The motion is fully briefed (*see* ECF Nos. 41, 47) and does not require further argument, *see* E.D. Mich. LR 7.1(f).

## I. Factual Background

### A. The Building

In May 2015, Fred Kandah formed ABMK Property 6332, LLC, and purchased a large commercial building at 6332 Middlebelt Road in Garden City, Michigan. (ECF No. 31-12, PageID.1131–1132.) It is multiple buildings combined into one. (ECF No. 31-8, PageID.835.)

The original building was a rectangle slightly smaller than a standard basketball court—indicated in the image below with a green, dashed border. (*See* ECF No. 38-4, PageID.3075.) An L-shaped structure—shown below with a yellow, dotted outline—was later added, resulting in a single-story building about the size of two tennis courts:



(*See* ECF No. 31-2, PageID.678; ECF No. 31-8, PageID.835; *see also* ECF No. 31-8, PageID.842.) The L-shaped structure itself had two distinct sections/additions: a longer but almost equally wide rectangle added to the south of the original structure and a 600-square-foot rectangle added to the northwest. (ECF No. 31-8, PageID.835; ECF No. 31-13, PageID.1388; ECF No. 38-4, PageID.3075.) The red, smallest rectangle in this aerial image is where the roof partially collapsed, leading to this suit.

Notably, each roof was different. Four features, as described by ABMK's roofing contractor and expert Robert Saddler, are relevant. First, slope. The original structure and larger addition both had flat roofs, while the smaller addition had an angled roof. (ECF No. 31-13, PageID.1342–1344; *see* ECF No. 30-9, PageID.622.) Second, drainage pattern. The roof system "didn't drain well"; water from both the angled roof and the newer flat roof drained onto the original roof and concentrated where the flat roofs met. (ECF No. 31-13, PageID.1336, 1344, 1354–1358, 1599–1601; *see* ECF No. 30-9, PageID.621–622.) Third, materials. The original roof was largely

wooden,[1] and the flat roofs were joined by a wooden beam. (ECF No. 31-8, PageID.835; ECF No. 31-13, PageID.1325–1326, 1342–1343; ECF No. 38-4, PageID.3075.) Finally, connection points. The flat-roofed sections were built without an "expansion joint" connecting them, so each section moved independently and the materials at the juncture split and cracked over time. (ECF No. 31-13, PageID.1325, 1347, 1607–1608, 1628, 1637.)

In short, water was draining and pooling in the same place that the roof was splitting—where the collapse would later occur.

## B. Repair History

When Kandah purchased the commercial building, it already had a tenant, who was operating a kitchen and bath remodeling company out of the building's warehouse and showroom. (ECF No. 31-10, PageID.1094; ECF No. 31-12, PageID.1108, 1132–1134, 1157; ECF No. 32-9, PageID.2261.) Kandah renewed the tenant's lease and has apparently continued to do so since. (ECF No. 31-12, PageID.1109, 1132–1133.)

In only a few days, the tenant reported a water leak to his new landlord. (ECF No. 32-13, PageID.1574; *see* ECF No. 31-7, PageID.817; ECF No. 32-12, PageID.1258–

---

[1] The roofs of the original building and larger addition were built with the same waterproof surface material (modified bitumen). (*See* ECF No. 31-8, PageID.835; ECF No. 38-4, PageID.3075; *see also* ECF No. 31-13, PageID.1342–1343.) But the original building had a plywood base and a mostly wooden support structure (evenly spaced wooden beams laying perpendicular to a central steel beam), while the larger addition had a fire-resistant base (made of gypsum, a soft mineral) and a steel support structure. (ECF No. 31-8, PageID.835; ECF No. 38-4, PageID.3075.) The smaller addition had a plywood base like the original building, but unlike the original roof it was pitched and shingled. (ECF No. 31-8, PageID.835; ECF No. 38-4, PageID.3075.)

1259.) So Kandah called Robert Saddler, his decades-long roofer for several other commercial buildings he owns. (ECF No. 31-12, PageID.1135–1136; No. 31-13, PageID.1569–1571, 1574, 1633.) Saddler is the owner of C&K Roofing Systems and ABMK's roofing expert in this litigation. (*See* ECF No. 38-4.) Saddler investigated and fixed the leak—the first of many such repairs.

Between May 2015, when ABMK bought the building, and April 2019, just before the partial roof collapse, Saddler made eleven total visits to the property, ten of which were responses to leaks the tenant reported. (ECF No. 31-7.) And leading up to the collapse, Saddler began noting in his invoices that the "roof does not drain well." (*Id.* at PageID.822, 826–827.) He also started finding "field seam separation[s]," i.e., splits in the roof's surface material, and made three repairs to field seam separations near the site of the collapse, including just the month before. (*See id.* at PageID.822, 825–827.) As Saddler put it, he was making only "band aid" repairs (ECF No. 31-13, PageID.1598; *see id.* at PageID.1337) until Kandah was ready to do more major renovation (*id.* at PageID.1630), which Saddler assumed included replacing the roof (*id.* at PageID.1352; *see id.* at PageID.1619–1621).

### C. The Collapse

But then, on Tuesday, May 28, 2019, right after the Memorial Day holiday, Kandah's tenant called and informed him that part of the roof had collapsed. (*See* ECF Nos. 31-11, 31-17.) Kandah would later learn that the size of the collapsed portion was about 400 square feet (ECF No. 38-4, PageID.3076; *see* ECF No. 31-4, PageID.725) and that the collapse occurred at the meeting point between the flat

roofs, near the crook of the "L" shape formed by the later-added building sections (ECF No. 31-8, PageID.842; see ECF No. 31-13, PageID.1326, 1332).

The tenant could not say when the damage happened. (ECF No. 31-12, PageID.1255.) Because of the holiday weekend, he had not been in to work for several days. (*Id.*) But Kandah recalled that there was a thunderstorm that Saturday and that wind damage had been reported in the area. (*Id.* at PageID.1256.) So he "naturally assumed" the collapse was due to the wind. (ECF No. 30-9, PageID.620.) He called Central to file a claim, relaying that he had not witnessed the collapse occur, did not know when it happened or what exactly caused it, and "assumed it was due to recent tornados in their area." (ECF No. 31-10, PageID.1104.)

Two days later, Central sent an independent adjuster to investigate the damage and identify its cause. (*See* ECF No. 31-4, PageID.725; ECF No. 31-17, PageID.1702.) Saddler inspected the collapse at the same time. (*See* ECF No. 38-4, PageID.3075, 3078; *see also* ECF No. 31-6, PageID.760.) Based on the independent adjuster's findings and photos, Central concluded that several policy exclusions applied and barred coverage. (*See* ECF No. 31-17; *see also* ECF No. 52-4, PageID.3617–3620.) An agent informed Kandah over the phone that coverage would be denied (ECF No. 52-4, PageID.3620) and followed up with a written denial letter four days later (ECF No. 31-17).

In May 2021, ABMK filed suit in state court for breach of contract. (ECF No. 1, PageID.7–10.) Central removed the case to this Court (*see id.*), and ABMK amended its complaint (ECF No. 4). Following the close of discovery in September 2023,

6

Central moved for summary judgment. (ECF No. 31.) ABMK opposes the motion.
(ECF No. 41.)

## II. Legal Standards

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if the evidence permits a reasonably jury to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *See Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

One way that the moving party may discharge its initial summary judgment burden is by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (citing Fed. R. Civ. P. 56(c), (e)). If the moving party does so, the party opposing the motion must do more than rely upon allegations or speculation—it "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of

summary judgment." *Cobb v. Keystone Memphis, LLC*, 526 F. App'x 623, 630 (6th Cir. 2013) (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995)). The Court construes the facts in the record, and reasonable inferences that can be drawn from those facts, in the light most favorable to the nonmoving party. *Matsushita,* 475 U.S. at 587.

### B. Insurance Policy

Both parties agree that Michigan law governs the Court's interpretation of the insurance policy. *See, e.g.*, *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008). In Michigan, an insurance contract is generally interpreted like any other contract. *Stryker Corp. v. XL Ins. Am.*, 735 F.3d 349, 354 (6th Cir. 2012); *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005). The Court "looks to the contract as a whole," *Auto-Owners Ins. Co. v. Harrington*, 565 N.W.2d 839, 841 (Mich. 1997), to "effectuate the intent of the parties," *Health v. State Farm Mut. Auto. Ins. Co.*, 659 N.W.2d 698, 699 (Mich. Ct. App. 2002) (per curiam) (citing *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 433 (Mich. 1992)), and it enforces unambiguous terms as written, *see Rory*, 703 N.W.2d at 30.

"Michigan courts engage in a two-step analysis when determining coverage under an insurance policy: (1) whether the general insuring agreements cover the loss and, if so, (2) whether an exclusion negates coverage." *Turek Enters., Inc. v. State Farm Mut. Auto. Ins. Co.*, 484 F. Supp. 3d 492, 499 (E.D. Mich. 2020) (quoting *K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 821 (6th Cir. 2018)); *see Hunt v. Drielick*, 852 N.W.2d 562, 565 (Mich. 2014). Notably, under Michigan law, if any one

policy exclusion applies to the insured's particular claims, the insured loses coverage under the policy. *See Seaway Cmty. Bank v. Progressive Cas. Ins. Co.*, 531 F. App'x 648, 651 (6th Cir. 2013) (citing *Churchman*, 489 N.W.2d at 434). "Exclusionary clauses in insurance policies are strictly construed in favor of the insured." *Churchman*, 489 N.W.2d at 434. That said, "[c]lear and specific provisions that limit coverage must be given effect because an insurance company cannot be held liable for a risk that it did not assume." *Matthews v. Harleysville Ins. Co.*, 826 F. App'x 508, 512 (6th Cir. 2020) (alteration in original) (quoting *Jervis Webb Co. v. Everest Nat'l Ins. Co.*, 650 N.W.2d 722, 725 (Mich. Ct. App. 2002)).

### III. Waiver and Estoppel

A brief word on ABMK's arguments about waiver and estoppel.

The policy that Central issued to ABMK provides coverage for "direct physical loss" not otherwise excluded or limited by a policy provision. (ECF No. 31-18, PageID.1759.) Central argues that multiple exclusions apply and bar coverage for ABMK's roof damage. But ABMK argues Central should be estopped from asserting any exclusions other than the one it cited in its initial phone call informing Kandah of the coverage denial.

The parties agree on the relevant facts. After Central completed its review of ABMK's claim for the partial roof collapse, a claims representative called Kandah to advise him that Central was denying coverage. (*See* ECF No. 52-4, PageID.3620–3621; ECF No. 41, PageID.3201.) Per a contemporaneous entry in his work log, the representative "explained the findings of [Central's] investigation and explained that

9

[Central] did not find coverage for the loss as it was a result of [the] poor condition of the building's roof (wear & tear) which is not covered under the [policy]." (ECF No. 52-4, PageID.3620–3621.) He also "told [Kandah] a disclaimer letter would be drafted and sent to him via certified mail." (*Id.* at PageID.3621.)

That phone call was on Thursday, June 27, 2019, and the promised letter followed on Monday, July 1, two business days later. (ECF No. 52-4, PageID.3620–2621; *see* ECF No. 31-17.) The letter detailed the findings of the independent adjuster's inspection, including that "the roof covering was in poor condition," and cited multiple bases for denying coverage: "wear and tear, rot, deterioration, continuous or repeated water seepage, and faulty or inadequate workmanship . . . specifically excluded under the policy." (ECF No. 31-17, PageID.1702.) The letter ended with a reservation of "any other policy term, condition, exclusion or other defense to coverage" that Central may have. (*Id.* at PageID.1705.)

But according to ABMK, "the oral denial given by [the claims representative] operated [as] a waiver of other exclusions and Defendant is estopped [from] assert[ing] other defenses other than the 'wear and tear' exclusion cited in [the representative's] oral denial." (ECF No. 41, PageID.3208.) The Court disagrees.

As a threshold matter, Michigan courts apply waiver or estoppel in only "limited" circumstances, given the strong presumption against forcing an insurance company to cover a risk it did not agree to cover under the policy's express terms. *Kirschner v. Process Design Assocs., Inc.*, 592 N.W.2d 707, 709 (Mich. 1999); *Carter v.*

10

*Owners Ins. Co.*, No. 356556, 2022 WL 1512045, at *5–6 (Mich. Ct. App. May 12, 2022). ABMK does not and cannot argue that this case falls into an exception to the general rule against insurance by waiver or estoppel.

First, waiver. Waiver is the voluntary and intentional relinquishment of a known right. *E.g.*, *Walters v Nadell*, 751 NW2d 431, 435 n.14 (Mich. 2008). This is clearly inapplicable. Central did not intend to relinquish any defenses where its agent told Kandah on the phone that a formal letter would follow, and it certainly did not effect a relinquishment where a letter did follow in a matter of days. Even defenses not included in a formal denial letter are not necessarily waived.[2] As explained in the very Sixth Circuit case that ABMK relies on for its waiver argument, "Permission to add a new defense by amendment is within the discretion of the trial court, and where the . . . [insurance company] subsequently became aware of other instances of fraud during discovery, [there is] no abuse of discretion in allowing [the insurer] to plead additional grounds of fraud in its answer and in the final pretrial order." *J.C. Wycoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1489 (6th Cir. 1991); (*see* ECF No. 41, PageID.3208); *see also Provident Life & Acc. Ins. Co. v. Adie*, 176 F.R.D. 246, 249–50 (E.D. Mich. 1997) (holding that defense not included in coverage denial letter was not waived where insurer learned relevant facts only later and reasoning

---

[2] Indeed, the relevant question under Michigan law is generally whether the insurer waived or is estopped from asserting defenses not included in its *denial letter*. *See, e.g.*, *GEO Fin., LLC v. Univ. Square 2751, LLC*, No. 13-14299, 2014 WL 7369940, at *7 (E.D. Mich. Dec. 29, 2014) ("Under Michigan law, in certain circumstances, an insurer's statement of particular defenses in a denial letter, coupled with the failure to cite other specific policy provisions, effects a waiver of its right to raise other, unstated defenses in later proceedings.").

that insurer, by asserting defense in its answer, gave "sufficient notice of the defense from the very early stages" of litigation). So Central's courtesy call to ABMK to explain its denial decision certainly did not waive any exclusions it asserted mere days later in its still-prelitigation denial letter and then again in its answer to ABMK's complaint.

Next, estoppel. Estoppel arises by operation of law when an insured rightfully but detrimentally relies on the acts or representations of the insurer. *Ruddock v. Detroit Life Ins. Co.*, 177 N.W. 242, 248 (1920). But ABMK does not argue it relied on Central's verbal representations. Nor could any reliance be reasonable or prejudicial where it is undisputed that Central said a letter detailing the reasons for denial would follow the phone call and that letter arrived two business days later.

So Central has not waived and is not estopped from asserting any of the defenses it raises now.

### IV. Insurance Policy and Exclusions

In its motion, Central asserts that four exclusionary clauses apply: "exclusions for collapse, wear and tear, decay or deterioration, and/or continuous or repeated seepage or leakage of water or the presence of moisture over a period of 14 days or more." (ECF No. 31, PageID.670; *see* ECF No. 31-18, PageID.1761–1762.) Any one of these exclusions is dispositive and provides a complete defense to ABMK's claims if Central shows it applies.

## A. "Continuous or Repeated Seepage or Leakage of Water"

Start with the exclusion for continuous or repeated water seepage or leakage. Under this exclusion, Central "will not pay for loss or damage caused by or resulting from . . . [c]ontinuous or repeated seepage or leakage of water, or the presence of . . . moisture . . . that occurs over a period of 14 days or more." (ECF No. 31-18, PageID.1761–1762.) The Court takes this exclusion in two parts: the water seepage itself and the duration of that seepage.

Neither side disputes that there was "seepage or leakage of water, or the presence of . . . moisture" in the roof.

Indeed, ABMK's experts accept that "water infiltrated and saturated the wood." (ECF No. 32-9, PageID.2261 (report of ABMK's expert structural engineer opining that "the roof collapse[d] due to water infiltration and saturation"); *see, e.g.*, ECF No. 31-13, PageID.1394–1396, 1430–1431 (deposition of ABMK's expert roofer); ECF No. 38-4, PageID.3036 (second supplemental expert disclosure of ABMK's expert civil engineer opining that "wind uplift broke the membrane of the roof and caused the water to go into the wood joists and caused the joists to collapse"); *see also* ECF No. 31-9, PageID.1057–1059 (deposition of ABMK's expert civil engineer).)

And ABMK itself concedes this point. Its arguments include that rainwater entered the roof due to wind uplift (ECF No. 41, PageID.3200 ("[A] windstorm[] caus[ed] the roof to be pushed back and result[ed] in *copious amounts of water* flowing into the wood framing structure of the building below . . . ." (emphasis added))); that the extent of the water leakage was not visible or known to Kandah (*id.* at

13

PageID.3216 ("[T]he vast majority of leakage problems were being addressed . . . ."));
and that freeze-thaw cycles played a role (ECF No. 4, PageID.65 ("The roof collapse
also had been contributed by [sic] a prior roof membrane breach due to preceding
wind damage and resulting in water infiltration and saturation of wood during the
freeze-thaw cycle."))).

At bottom, ABMK fails to show a genuine dispute of material fact as to whether
the water seepage or leakage was continuous or repeated for over two weeks.

Go back to ABMK's roofing expert, Robert Saddler. He concluded that water
was entering the roof for a very long time. Saddler had been this building's roofer for
as long as ABMK has owned it (*see* ECF No. 31-12, PageID.1135; ECF No. 31-13,
PageID.1569–1571) and was one of the only two professionals to personally inspect
the site of the collapse just after it occurred (*see* ECF No. 31-4, PageID.725; ECF No.
38-4, PageID.3075, 3078). Based on what Saddler observed during that inspection
and later while tearing up the roof to replace it, he testified, "I don't know how that
water [was] getting in there. But it was definitely getting in there and had been
getting in there for some time." (ECF No. 31-13, PageID.1325; *see id.* at PageID.1601
("Seeing these pictures and after that event happened, I think that [the newer, flat]
roof was leaking up above somewhere . . . [and the water was] meandering down
[inside the wooden, flat roof] and getting to that point right there for years and not
known to anybody."); *id.* at PageID.1635 ("I do know one thing: it's been happening
for many, many years. It wasn't just the last five years that that was
deteriorated. . . . That's been ongoing for probably as soon as the building was built

because it wasn't built correctly."); *see also id.* at PageID.1630 ("I have no idea [where the water was leaking from]. It could have been coming in from multiple places and multiple years.").)[3]

Saddler explained the mechanics of the collapse this way: Because the flat-roofed sections of the building moved independently, "at the area where those two buildings joined . . . there was a continuous splitting of material . . . along the wood joist" connecting the sections, throughout the roof's interior, and within the roof's surface layer (the "field seam separations" visible to Saddler that he had been repairing). (*Id.* at PageID.1325–1326; *see id.* at PageID.1608 ("[T]here should have been an expansion joint there and there's not. So that's why it kept on splitting. I'm sure that was happening throughout the life of that building . . . and that roof got wet. . . . The joist . . . [and] joist hangers got wet.").) The roof's drainage pattern, described above, caused water to pool in that same area. (*See, e.g.*, *id.* at PageID.1325–1326, 1601–1604.) So cracks and gaps formed in the wood, and water entered, "loosen[ing] up" the membrane (surface layer), "infiltrat[ing] down inside" (*id.* at PageID.1334), and saturating support beams and other interior structures (*see*

---

[3] Water seepage or leakage need not be constant to be excluded. Repeated water seepage is an equal bar to coverage under this policy exclusion. So Saddler's report *supports* rather than undermines coverage when he opines that "there is no evidence of one constant water infiltration event in this property. Rather, there are several separate and distinct events that occurred over the course of time. These events are in various sections of the property." (ECF No. 38-4, PageID.3078; *see also* ECF No. 31-13, PageID.1410, 1583–1586 (testifying that he fixed each leak and seam separation as they cropped up, such that no leaks were active or ongoing).)

*id.* at PageID.1334, 1603–1604). When the roofing components "[could not] soak up anymore" (*id.* at PageID.1603), they "buckle[d]" (*id.* at PageID.1336).[4]

The level of rot and deterioration that Saddler and others observed supports Central's assertion that water was entering the roof for an extended period.

Referring to the wooden beam that collapsed, Saddler testified that "[i]t would have taken a long time for that beam—that old-fashioned, old timey beam—to deteriorate like that. . . . That's been going on for lots of years." (ECF No. 31-13, PageID.1631 (cleaned up); *see id.* at PageID.1332 ("[T]he wood beam that separates those two buildings[] got wet over a period of time[] [and] allowed these trusses to rot and deteriorate . . . .").) Central's independent adjuster Ken Lift, the other professional to personally inspect the damage just days after the collapse, agreed with Saddler. He summarized his findings in an email within a few hours of completing his inspection: "The roof covering is in poor condition and appears to have been leaking for an extended period of time. There are multiple water stains and possible mold growth found throughout the interior. . . . We found heavy rot to the ridge board to which the fallen joist had been nailed." (ECF No. 31-4, PageID.725.) In other words,

---

[4] What was more, once he began tearing up the roof to replace it after the collapse, Saddler discovered "seven layers of built-up roofing" (ECF No. 38-4, PageID.3075; *see id.* at PageID.1420, 1423), which told him that prior owners responded to leaks by simply adding layers to the roof (*see id.* at PageID.1334, 1350, 1355, 1468). Like the other roofing material in that area, the built-up layers failed to accommodate the building's natural movement. (*See id.* at PageID.1333–1334.) So the layers were "brittle," "cracked," and taking in water. (*See id.*) And "[t]here was moisture trapped underneath the exposed last and final roof" layer, "put[ting] the decking . . . in jeopardy" (*id.* at PageID.1421) and "attacking whatever's underneath of it" (*id.* at PageID.1603).

wrote Lift, "[t]he water infiltration went on long enough to cause several wood beams and rafters to rot and deteriorate to the point of collapse." (*Id.* at PageID.724.)

Lift's email included photographs he took during his inspection. (ECF No. 31-5.) The photos showed the collapse and, according to Lift's captions, signs of "repeated seepage of water" on the inside of the building (*id.* at PageID.747, 752; *see id.* at PageID.743–745, 749–750, 752–753) and other problem areas of the roof where he could tell, for example, that structural beams were "beginning to fail" (*id.* at PageID.733; *see id.* at PageID.732, 734–735; *see also* ECF No. 31-5, PageID.725 ("The joist also appear [sic] to be sagging over a slightly smaller area near the east end of the north roof.")). He captioned seven of the 29 photos, "[h]eavy rotting of ridge board . . . to which fallen joist were secured." (ECF No. 31-5, PageID.736–742.) When shown Lift's photos during his deposition, ABMK's civil engineer Tarik Najib agreed that the roof structures were "rotted." (ECF No. 31-9, PageID.1028–1029.) And while he noted that "[n]obody can tell" how long the deterioration in the photos would take to develop, he said that more than a year would "[f]or sure" be necessary. (*Id.* at PageID.1026.) Central's roofing expert Ron Lucy inserted some of Lift's photos into his report (*see* ECF No. 31-3, PageID.709) and added his own descriptions based on what he saw, such as "Failed Area – Rot to Decking and Joists" (*id.* at PageID.710; *see* ECF No. 31-5, PageID.748) and "Framing Rotted Away at Failure Area" (ECF No. 31-3, PageID.712; *see* ECF No. 31-5, PageID.739). Based on his review of those photos and the deposition testimony and reports from ABMK's experts, Lucy concluded, as Lift and Saddler had, that "[t]he rotted condition of the members indicated that leaks

17

had been occurring at this location for years." (ECF No. 31-3, PageID.720; *see also* ECF No. 31-8, PageID.840 (report of Central's expert engineer) (opining that Lift's photos "indicate a history of water infiltration . . . likely years" and noting "advanced state of deterioration visible in the photographs").)

Lucy also reviewed aerial images of the roof captured by Google Earth between April 2015, around the time of ABMK's purchase, and April 2019, about a month before the partial roof collapse. (ECF No. 31-3, PageID.720–722; *see* ECF No. 31-2.) The images, he concluded, illustrate the roof's gradual deterioration—and that "[t]he roof failure was not a result of an abrupt one-time sudden event." (ECF No. 31-3, PageID.720.) In particular, he opined that images from July 2018 and April 2019 show a "depression in the roof" right around where the collapse occurred, which was also where Saddler had recently been patching field seam splits. (*Id.* at PageID.721–722; *see* ECF No. 31-2, PageID.682–684.) The "depressed area" grew over time, which according to Lucy "indicated further subsidence to the deck and framing members." (ECF No. 31-3, PageID.722.) He highlighted that growing depression with arrows:

 

(*See id.* at PageID.721–722 (July 2018 on left, April 2019 on right); ECF No. 31-2, PageID.682–684.) Lift similarly testified during his inspection that "[t]he roof was sagging and depressed because it was rotting." (ECF No. 31-6, PageID.777. *But see*

ECF No. 31-13, PageID.1336, 1608 (Saddler testifying that he never noticed that the roof was sagging while he made repairs).)

So there is no genuine dispute of material fact that water had infiltrated the roof for a sufficiently long time so as to constitute "continuous" or "repeated" seepage for at least two weeks. As such, ABMK's roof damage is not covered by its insurance policy.

### B. "Wear and Tear" and "Decay or Deterioration"

Much of the same evidence likewise supports application of the policy's exclusions for both "wear and tear" and "decay or deterioration." Because these terms are not defined in the policy, they are given their plain meaning. *See Greene v. AP Prods., Ltd.*, 717 N.W.2d 855, 860 (Mich. 2006); *McCartha v. State Farm Fire & Cas. Co.*, No. 326689, 2016 WL 4375659, at *3 n.1 (Mich. Ct. App. Aug. 16, 2016); *Matthews*, 826 F. App'x at 514–15. The Sixth Circuit, applying Michigan law, has explained that the plain meaning of "wear and tear" is defined as "[d]eterioration caused by ordinary use; the depreciation of property resulting from its reasonable use." *Matthews*, 826 F. App'x at 515–16 (alteration in original) (citation omitted). And Michigan courts have said that "'deterioration' . . . is simply 'worse, inferior,'" *McCartha*, 2016 WL 4375659, at *3 n.1 (citation omitted), and "decay" refers to "decomposition; rot . . . a gradual and progressive decline," *Hani & Ramiz, Inc. v. N. Pointe Ins. Co.*, No. 316453, 2014 WL 523492, at *4 (Mich. Ct. App. Feb. 4, 2014); *see Joy Tabernacle-The New Testament Church v. State Farm Fire & Cas. Co.*, 616 F.

App'x 802, 808–11 (6th Cir. 2015) (discussing Michigan courts' interpretation of "decay").

In light of these definitions and the evidence presented, overlap between the exclusions makes sense.[5] Take the photos alone. The aerial images, according to Lucy, display the worsening condition of the roof over time (deterioration), both writ large and in the area of the collapse. *See, e.g.*, *McCartha*, 2016 WL 4375659, at *3 n.1 (defining "deterioration" to mean "simply 'worse, inferior'"). Lift's post-collapse photos illustrate the same broad deterioration. He photographed not only the collapse (the "[n]orthwest roof") but also areas of concern throughout the roof, including what he captioned "[f]ailed seam repair on south section of west roof," "[r]oof failing near east end of north roof," "[j]oist beginning to fail near bottom of photo [south of collapse]," and "[w]est roof, multiple patches and repairs." (ECF No. 31-5, PageID.727–728, 732–734.) And with respect to the collapse itself, Lift photographed "heavy rotting" on multiple roof structures. (*See id.* at PageID.736–742; *see also* ECF No. 31-9, PageID.1029 (deposition of ABMK's expert civil engineer) ("It is rotted.").) This rot constitutes decay even on a "narrower, technical reading of 'decay'" as "organic rot or deterioration from a normal state." *See Joy Tabernacle*, 616 F. App'x at 808–09.

---

[5] As Central put it, the roof damage was "caused by 'collapse' (caused by decay)"; "the failed beam which caused the collapse rotted, decayed and failed because it had been subject to years of continuous or repeated seepage or leakage of water and he presence of moisture"; "the collapse was caused by a rotted, deteriorated, decayed ridge beam"; and "'wear and tear' . . . encompasses loss or damage caused by or resulting from decay or deterioration." (ECF No. 31, PageID.670–671.)

Whether termed decay, deterioration, or wear and tear, and, as discussed below, irrespective of any wind conditions, there is no genuine dispute of material fact that the roof was in a state of disrepair for a long time before it partially collapsed. *See Matthews*, 826 F. App'x at 516 (acknowledging "concern" about interpreting "wear and tear" too broadly but explaining "that concern certainly does not arise here, where the roof had outlived its intended life twice over and had been poorly maintained and monitored during that time"). As Saddler put it, "substandard roofing practices" were used during construction at least 60 years prior (ECF No. 31-13, PageID.1580–1585), and ongoing "band aid" repairs (*id.* at PageID.1598) were a temporary means to extend the life of the roof until it was replaced (*id.* at PageID.1635 ("[T]he roof wasn't in all that good of shape. . . . I mean, I would have liked to just have tore everything off. But we were going to do that when the time comes.")).

Despite the ample evidence that the roof was in a state of disrepair, deterioration, and decay, ABMK gives short shrift to these exclusions, lumping each exclusion together under a single heading, quickly dispensing with each, and still mischaracterizing the issues to do so. So ABMK fails to demonstrate any material fact issue as to the wear and tear and decay or deterioration exclusions.

### C. "Windstorm"

Instead, ABMK's focus is on wind. It attempts to establish a material factual dispute by arguing that "there was a windstorm that had occurred causing the

21

damage to the roof on Memorial Day weekend." (ECF No. 41, PageID.3209.) This argument fails for many reasons.

**1.**

ABMK's freestanding "windstorm" argument ignores or misunderstands the "default rule" of causation that applies to insurance policies interpreted under Michigan law—that the mere occurrence of a covered cause of loss does not automatically preserve coverage if it coincides with an uncovered cause of loss. While individual exclusion provisions can modify that default rule, Michigan law also provides that the application of any one exclusion precludes coverage.

On similar facts and arguments and under identical policy provisions, *see Iroquois on the Beach, Inc. v. Gen. Star Indem. Co.* (*Iroquois I*), No. 06-233, 2007 WL 2984197, at *7–8 (W.D. Mich. Oct. 12, 2007), *affirmed by* 550 F.3d 585 (6th Cir. 2008), the Sixth Circuit clarified Michigan's default causation rule, *see Iroquois on the Beach, Inc. v. Gen. Star Indem. Co.* (*Iroquois*), 550 F.3d 585 (6th Cir. 2008). There, the insurance company denied coverage based on an identical water seepage exclusion. *See Iroquois*, 550 F.3d at 587. The plaintiff hotel argued that its water damage should be covered because it was caused by both an uncovered cause of loss (continuous or repeated water seepage or leakage) and a covered cause of loss (a purported windstorm). It argued, just as ABMK does here, that "the asserted exclusions are inapplicable because the loss at issue is within the definition of 'Specific Causes of Loss.'" *Iroquois I*, 2007 WL 2984197, at *5; (*see* ECF No. 41, PageID.3209.) The Sixth Circuit rejected that argument and articulated "the default

22

rule under Michigan law," also known as the "anti-concurrent causation rule," that "a loss is *not* covered when it is concurrently caused by the combination of a covered cause and an excluded cause," even in the absence of express language that the exclusion applies regardless of any other contributing cause. *Iroquois*, 550 F.3d at 588. So the court held that "the exclusion for seepage or leakage of water for at least fourteen days [was] dispositive," windstorm or no windstorm. *Id.*

To be sure, the Sixth Circuit recently clarified that Michigan's default causation rule is not absolute. Because the policy's plain language controls, parties can contract out of the default rule as to a given exclusion. *Matthews*, 826 F. App'x at 514–16. In *Matthews*, for example, the insured did not dispute that the defective design of its roof drain (an excluded cause of loss) had caused its interior water damage. *Id.* at 513; *see also Matthews v. Harleysville Ins. Co.* (*Matthews I*), 412 F. Supp. 3d 717, 720 (E.D. Mich. 2019), *affirmed by* 826 F. App'x 508. But it successfully argued that the default causation rule did not control because it had been modified by the policy's express terms: the relevant exclusion (design defect resulting in loss) contained an express exception (called an "ensuing-loss clause") that preserved coverage for the insured's damage if an excluded cause of loss (the defective drain) resulted in a covered cause of loss (weight of rainwater ponding on roof) that led to the damage. *Matthews*, 826 F. App'x at 514. In other words, because the defective design exclusion stated that the insurer "will pay . . . if an excluded cause of loss that is listed in [this section] results in a Covered Cause of Loss [elsewhere defined to include "weight of rain that collects on a roof"]," the default rule should not be read

23

into that exclusionary clause. *Id.* at 513; *Matthews I*, 412 F. Supp. 3d at 721. However, the insurer still prevailed because other exclusions, such as for wear and tear, also applied on the facts, and without similar language those clauses had not abrogated the default rule. *Matthews*, 826 F. App'x at 514–15.

In sum, the default rule of causation may be modified by the express terms of an insurance policy to preserve coverage even if an excluded cause of loss contributes to damage. But those modifications "do not necessarily preserve coverage with respect to every exclusion in an insurance policy," and courts "must continue to examine the entire Policy 'as a whole,' including the . . . other exclusions or limitations identified." *Id.* at 514 (citation omitted). So Michigan courts read the default causation rule into exclusions that are ambiguous or silent on the issue. *See id.* at 515 ("Unlike the Negligent Work Exclusion, this 'Wear and Tear Exclusion' [worded identically under that policy as under Central's policy] does not have an ensuing-loss clause. So the default, anti-concurrent causation rule applies, and if wear and tear contributed to the loss, the Policy does not cover it."); *Zedan v. SGL No. 1 Ltd.*, 527 F. Supp. 3d 937, 943 (E.D. Mich. 2021) ("[U]nder Michigan law, a court should apply Michigan's default rule to a policy exclusion . . . even if the exclusion does not contain such a clause and even if a different exclusion in the same policy does.").

ABMK makes no attempt to negate these default or exclusion rules. Nor could it. Put in concrete terms, the water seepage exclusion asserted here, as in *Iroquois*, states that damage caused by water seepage is not covered and does not itself identify any exceptions. So if damage is caused by water seepage, the mere contribution of a

24

"windstorm" does not create coverage, i.e., does not automatically constitute an exception to that exclusion, just because a windstorm constitutes an exception to *another* exclusion in the policy, even another exclusion also asserted by the insurer. Other exclusionary provisions can alter that calculus by specifically (or only ambiguously) making windstorms relevant in one way or another (e.g., preserving coverage where a windstorm precedes, contributes alongside, or itself causes an otherwise excluded cause of loss). But again, those exclusionary provisions' exceptions for windstorms do not affect other exclusions without such exceptions. And because Michigan law also provides that coverage is lost if any exclusionary clause applies, the modification of the default rule under one exclusion does not create coverage if another exclusion still applies.[6]

Here then, the mere occurrence of a windstorm, a "specified cause of loss" under the policy, does not create coverage.

## 2.

What is more, ABMK offers no credible evidence that a "windstorm" occurred let alone contributed to the partial roof collapse.

The policy does not define "windstorm," nor need the Court. ABMK offers a definition, which Central does not dispute: "a *violent* wind." (ECF No. 41, PageID.3211 (quoting *Clark v. Fid. & Guar. Fire Corp.*, 39 N.Y.S.2d 377, 379 (N.Y.

---

[6] These are related concepts. The default causation rule governs interpretation of an individual clause (whether it is relevant under that clause that a covered cause of loss occurred), while the exclusion rule governs the interaction of exclusionary clauses (providing that the applicability of any exclusion is a bar to coverage regardless of the applicability of, or exceptions to, any other exclusion).

City Ct. 1943)); *see also* ECF No. 30-8, PageID.522.) ABMK's expert meteorologist Charles Konrad does not contend that the wind was "violent" during the Memorial Day weekend. He describes "wind" itself—a "wind event," "gusts," and the interaction between wind, rain, and topography (ECF No. 30-8, PageID.508–509, 534)—but he is clear that the wind did not reach categorically "high" or "severe" levels (*see, e.g.*, *id.* at PageID.508, 522, 534–535; ECF No. 30-9, PageID.620).

ABMK pretends otherwise. It asserts, "According to the testimony of Dr. Konrad, a 'windstorm' occurred, on May 25th, 2019 that caused a roof breach." (ECF No. 41, PageID.3212.) In turn, its "windstorm" argument relies entirely on block quotations from Konrad's deposition testimony. (*Id.* at PageID.3209–3212.) But those block quotations are selectively excerpted to suit ABMK's argument. Notably, it quotes Konrad as saying that "unquestionably there was a wind event [on May 25] . . . the nearest . . . network revealed wind that gusted as high as . . . the low 32 miles an hour, something like that . . . That wind event, as I mentioned was . . . responsible for . . . the partial roof collapse" (*id.* at PageID.3211–3212)—then omits the very next sentences that show what Konrad meant by "the low [speed of] 32 miles an hour" (ECF No. 30-8, PageID.522). The Court presents the entirety of that testimony, in which Konrad testifies that there was no "violent" wind and further opines that a partial collapse was still possible because water leakage over time had weakened the roof[7]:

_____

[7] The Court notes that, absent qualifications not presented here, it would not consider a causation opinion on a roof collapse by a meteorologist. *See* Fed. R.

The question is, well, why did the roof collapse? These winds—maybe they weren't—*they didn't meet the National Weather Service definition of, you know, a severe thunderstorm event or high winds*, but often times there is damage when—when you have winds that are strong, but you would especially expect damage if—if there's some structure that was already compromised.

And in my opinion there was—the compromising that occurred had to do with the leak and a roof that brought water in, okay, and caused— over some period of time caused a weakening inside the internal structure of that roof there. *So that made the roof sufficiently weak so that when this wind event that came along, then it was basically the straw that broke the camel's back.*

*That it didn't take as much wind to cause this occurrence because of what—because what had already precipitated*—pardon the pun—the abnormal amount of precipitation that occurred over the prior month and especially there on April—*late on April 30th, very early on May 1st.*

(*Id.* (emphasis added).)

Konrad's testimony was consistent with his report (ECF No. 30-9), that the winds at the time of the collapse were not categorically high but were able to damage the roof because water had entered about a month prior and compromised the structure (*see id.* PageID.620 ("While these winds [on May 25] were likely below these thresholds [for High Wind Warnings and Severe Thunderstorm Warnings], they certainly could have been strong enough to cause the roof to collapse because the support structure had already been compromised by the effects of water infiltration into the roofing structure, as described by [the report of ABMK's expert structural engineer].")). Similarly, ABMK excerpts only Konrad's testimony that the May 25 "wind event" allowed rain to enter the roof (ECF No. 41, PageID.3212), omitting his

---

Evid. 702(a). The Court reproduces Konrad's testimony here only to show that even the evidence ABMK cites does not support its "windstorm" theory.

surrounding testimony that it was "[v]ery important" that "a heavy rain event" at the end of April had allowed "quite a bit of rainwater . . . into the roofing structure" (ECF No. 30-8, PageID.521).

### 3.

Indeed, as Konrad's testimony suggests, ABMK's expert civil engineer Tarik Najib offered a two-part theory to explain how the partial roof collapse could be caused by *non*violent wind, i.e., in the *absence* of a windstorm. This theory at least accounts for the objective weather data, unlike ABMK's windstorm argument. But it still fails to establish a genuine issue of material fact.

The theory is twofold. The first part of the theory is ABMK's central argument: the roof partially collapsed on May 25, 2019, because of wind. This theory is itself mere conjecture, as further discussed in the next section. ABMK concedes that the date of the collapse is unknown (*see, e.g.*, ECF No. 4, PageID.64; ECF No. 41, PageID.3200)—that it occurred some time between Thursday, May 23 (the earliest date the tenant could have left town) and Tuesday, May 28 (when the tenant returned and discovered the damage) (*see* ECF No. 30-9, PageID.620; ECF No. 31-12, PageID.1255–1257). But it maintains that the collapse coincided with a storm on Saturday, May 25, 2019. Even on Saturday, though, the wind was not technically "severe," and "only a light amount of rain fell during the weekend." (ECF No. 30-9, PageID.620.)

So the second part of the theory is that an earlier incident compromised the roof so that "it didn't take as much wind" to cause a collapse. (ECF No. 30-8,

PageID.522; *see id.* at PageID.509 ("Due to precipitation and infiltrating on the inside, the roof was weakened, and so the winds didn't need to be very strong in order for them to basically rip away that section of the roof." (cleaned up)); ECF No. 30-9, PageID.620; ECF No. 31-8, PageID.837.) That earlier incident, as the Court understands it, was a prior, windier day, most likely April 30, 2019, when wind lifted the roof's membrane and allowed rainwater to enter. (*See, e.g.*, ECF No. 30-8, PageID.522; ECF No. 30-9 (Konrad's expert report); ECF No. 31-9, PageID.880–882; ECF No. 38-4 (Najib's expert report).) ABMK, which adopted this theory in its complaint and elsewhere, contends that the initial "wind uplift" occurred after Saddler's April 12, 2019, service call (or else Saddler would have noticed, says ABMK), but by April 30, 2019 (the date of a heavy rainfall). (*See, e.g.,* ECF No. 38-4, PageID.3035; *see also* ECF No. 4, PageID.65 ("The roof collapse also had been contributed by [sic] a prior roof membrane breach due to preceding wind damage and resulting in water infiltration and saturation of wood during the freeze-thaw cycle."); ECF No. 31-9, PageID.883–889.) That April 30 rain, as well as "[h]igh precipitation" from then until May 25, got into and weakened the roof in time for Memorial Day weekend. (ECF No. 38-4, PageID.3035; *see id.* at PageID.3036 (Najib opining that "the seepage of water caused the wood to rot and weaken the structure of the roof," compromising the roof prior to the Memorial Day weekend); ECF No. 31-9, PageID.1058 (deposition of Najib) ("The wind . . . hit that weak spot and then caused it to collapse."); ECF No. 30-8, PageID.500 (deposition of Konrad); ECF No. 32-9, PageID.2261 (report of ABMK's expert structural engineer); ECF No. 41-6,

PageID.3419 (affidavit of ABMK's expert structural engineer); *see also* ECF No. 31-8, PageID.838.)

This theory itself undermines coverage. It is premised on the roof being compromised, whether by wear and tear, decay, deterioration, or water seepage, to the point that weaker winds could cause a partial collapse. And even if wind uplift allowed rainwater to enter the roof for the first time on April 30, that would mean continued or repeated water seepage lasting over two weeks.[8] Perhaps that is why ABMK abandoned its two-event theory, articulated in its complaint and in its experts' reports, for the argument in its instant response, that a windstorm occurred.

### 4.

Either way, ABMK's theory that "wind uplift" played any role in the collapse is pure speculation. ABMK offers no actual evidence of wind damage to the roof—on any occasion, let alone on two. And "mere speculation, conjecture, or fantasy" cannot create a genuine dispute of material fact to defeat summary judgment. *Clemente v. Vaslo*, 679 F.3d 482, 495 (6th Cir. 2012) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). Especially not where the water seepage exclusion is indifferent to the mere occurrence of a windstorm and where Central submits evidence that *contradicts* that wind played a role in the collapse.

---

[8] Although in theory rainwater could enter the roof on April 30 and not seep or leak continuously or repeatedly thereafter, that argument is at best assumed by ABMK and at worst inconsistent with the physical evidence. Indeed, ABMK's experts explained that their two-part theory not only accounts for the non-severe weather data from Memorial Day weekend but also accounts for the extent of the roof's deterioration, which would have required longer-term water intrusion.

Lucy, Central's roofing expert, concluded that the photographs taken of the collapse showed that the roof membrane was intact, not detached, where the collapse occurred—i.e., that there had been no wind uplift and in turn no rainwater was suddenly allowed to enter the roof. (ECF No. 31-3, PageID.719.) He explained:

> [The photos] show no wind related damage to the membrane. On the contrary, the membrane at the failure area was still in place and showed no evidence of detachment around the perimeters of the failure. Had the membrane been uplifted by winds, it would not have remained attached at the perimeters. The above photos clearly show that the membrane is pulled downward and still partially attached to the roof substrates [that collapsed]. Moreover, a one-time water intrusion event (had the membrane been uplifted) would not have caused the severe deterioration and rot to the framing members.

(*Id.*) Lucy also concluded that "[t]he failure occurred to an isolated area of the roof. This alone would rule out excessive winds or loading from heavy rains. These purported causes would not exhibit damage just to an isolated area of the roof." (*Id.* at PageID.720.) Lift, who saw the collapsed roof for himself and took the photographs on which Lucy opined, repeatedly asserted that he "didn't see any signs of wind damage when [he] was out there." (ECF No. 31-6, PageID.782; *see id.* at 765.) He reported the same finding in an email the day he inspected the roof, which was itself two days after the purported collapse date: "There are no signs of any recent damage to the roof due to wind." (ECF No. 31-4, PageID.725.) When asked during his deposition if he could "rule out" wind damage "entirely, he testified, "I believe so, yes." (ECF No. 31-6, PageID.782.)

ABMK's counter does not create a genuine issue of material fact. Its experts explained that they received other insurance claims for wind damage due to Memorial

Day storms. (*See* ECF No. 32-2, PageID.1984, 1992; ECF No. 47, PageID.3518.) But as seen here, an insurance claim for wind damage does not necessarily mean that wind damage occurred. And again, wind damage does not bypass the default causation rule.

Moreover, ABMK's experts who contend wind contributed to the collapse did not see it for themselves. Najib, along with ABMK's expert structural engineer Juan Snead, did not inspect the roof until July 2019 (*see* ECF No. 38-4, PageID.3035), just under two months after the collapse and well into Saddler's total replacement of the roof (*see* ECF No. 31-13, PageID.1316–1317). By then, much of the roof had been removed, including "[t]he roofing membrane and rotted wood joist," per Snead's report. (ECF No. 32-9, PageID.2261 (Snead's report); *see id.* at PageID.2262; ECF No. 31-9, PageID.876 (Najib confirming that he did not see the roof "in its damaged condition" and testifying that he believed the roof decking had been removed before his site visit); ECF No. 32-2, PageID.1982; *see also* ECF No. 31-9, PageID.1019–1020, 1023, 1026. *But see* ECF No. 32-2, PageID.1962 (Snead testifying that some of the roof's support beams were still there during the site visit and that "some of them were rotting").) In his deposition, Snead was forthcoming that he could not state the "primary cause" of the collapse (ECF No. 32-2, PageID.1986), had not seen evidence of wind uplift himself (*id.* at PageID.1983), and offered "just a hypothetical" for how the collapse occurred (*id.* at PageID.1993).

So ABMK fails to create a genuine issue of fact that wind was a cause of the collapse. Its theory depends on the occurrence of one if not two unwitnessed,

hypothetical "wind events." And its experts contend only that wind damage *could* explain or is consistent with a roof collapse such as the one at issue. But plausibility is not sufficient to overcome summary judgment.

### D. Striking "Affidavit"

Najib (ABMK's expert civil engineer) is ABMK's sole vehicle for contesting the water seepage exclusion. Specifically, ABMK relies entirely on a post-deposition affidavit from Najib that it filed with its summary judgment response. (ECF No. 41-5.) It insists that this affidavit alone—five paragraphs of which it directly pastes into its response—establishes that the water seepage exclusion is "meritless" and contested. (ECF No. 41, PageID.3219.)

But the Court will not consider what is in effect another supplemental expert disclosure. Najib's affidavit was filed well past the expert report and expert discovery deadlines, indeed after ABMK filed an initial expert report disclosure and a supplemental expert report disclosure and after Najib was deposed twice (after each disclosure), without ABMK seeking leave to file yet another supplement. It was also filed a month after the deadline for dispositive and *Daubert* motions and thus well past the time that would allow Central to file a *Daubert* motion in response (as Central timely did as to two other experts).

So the Court strikes Najib's affidavit as untimely under Federal Rules of Civil Procedure 26 and 37 and need not decide Central's motion to strike the affidavit under the sham affidavit rule (ECF No. 48).

33

In the absence of Najib's post-deposition affidavit, ABMK has no argument whatsoever to rebut the water seepage exclusion. It cites to no other record evidence, and it offers no arguments about what it contends the Najib affidavit shows (evidence that, if consistent with prior testimony, would be expressed elsewhere in the record). "A district court is not required to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989)). "'[J]udges are not like pigs, hunting for truffles' that might be buried in the record." *Id.* at 736 (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) (noting that a district court is neither required to speculate on which portion of the record a party relies nor obligated to "wade through" the record for specific facts).

ABMK's argument was skeletal and underdeveloped even with the now-struck block quotations of Najib's affidavit testimony.[9] And it is well established that "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir. 1997) (omission in original) (citations omitted).

---

[9] This includes ABMK's summary of facts—a list of citations accompanied only by phrases such as "Not visible from the inside." (ECF No. 41, PageID.3203; *see id.* at PageID.3203–3205.) Central's description is apt: ABMK's "'Fact Summary' is nothing but a list of talking points and headings. It says *nothing* factually substantive and instead places the entire onus on the Court to decipher the alleged facts and their supposed import." (ECF No. 47, PageID.3515.)

For example, Najib avers that "it is very possible that the decay or damage created by freeze-thaw cycle [sic] that contributed to the wood framing collapse in questions [sic] occurred within less than fourteen days and possibly as little as two or three days." (ECF No. 41, PageID.3218 (quoting ECF No. 41-5, PageID.3360).) So Najib does not even say that *is* what happened here—only that it was *possible*—and does not explain *how* it was possible.[10]

In fact, nowhere in ABMK's response does it explain its "freeze/thaw cycles" theory. (*See* ECF No. 31-3, PageID.719 (Lucy's expert report) ("Freeze/thaw affects occur over time and through the winter seasons. The loss occurred near the end of May 2019. It is unclear how freeze/thaw effects could even remotely have been a factor for this roof failure.").) Nor does ABMK even attempt to dispute the record evidence that freeze/thaw cycles occur across seasons, not days. (*See, e.g.*, ECF No. 30-8, PageID.535 (Konrad testifying that no freeze/thaw cycles occurred between April and May 2019 but would have occurred between 2015 and 2019); ECF No. 31-8, PageID.839 (report of Central's expert civil engineer) ("[T]he level of deterioration exhibited in the photographs would take months or years of exposure to moisture. Thus, it is clear that this condition did not occur over the course of the few days

---

[10] Which is not even to mention that Central argues that Najib's "opinions and conclusions are based upon a lack of foundation" (ECF No. 48, PageID.3546)—that Najib did not see any of the damage because the roofing materials in the area of the collapse were removed before his site visit (*see* ECF No. 32-9, PageID.2261), that Najib did not consider Lift's photos of the damage in preparing his report (ECF No. 31-9, PageID.857–859), and that Najib relied on Kandah's representations that the roof was well maintained and showed no signs of a water leak as of mid-April (*id.* at PageID.1023, 1060).

associated with the subject time period (i.e., May 23 to May 28). This is even supported by [the reports of Najib and Snead] indicating that freeze-thaw cycles contributed to the water infiltration into the wood framing."), ECF No. 31-9, PageID.906–907 (Najib testifying that there was no freeze/thaw cycle between April 30th and Memorial Day weekend, only "maybe [a] thaw-out cycle" from the freezing that occurred over the winter), PageID.948 (Najib testifying that "the thaw and freeze cycle, that continues for many years. It could be a year, two, three, four years. Who knows? But that doesn't really cause a sudden failure like that to happen").)

None of this is sufficient to defeat Central's robustly supported summary judgment motion.

### E. "Collapse"

Finally, ABMK attempts to rely on the exceptions to the policy's collapse provision as though they offer exceptions to every exclusion provision. This, too, results from a misunderstanding of the issue.

Central generally excludes coverage when a "[c]ollapse" causes damage. (ECF No. 31-18, PageID.1762.) But it will provide coverage if the collapse is "abrupt" and "caused by . . . [b]uilding decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse." (*Id.* at PageID.1766.) In short, as relevant here, damage caused by a collapse is not covered, but the policy provides a narrow exception for damage caused by an *abrupt* collapse caused by decay that is *both hidden and unknown*. But beyond that narrow exception for that specific situation, the policy does not ask whether a cause of loss was hidden or unknown. So

while Central does argue that the collapse exclusion applies, and ABMK responds that the abrupt-collapse-hidden-decay exception intervenes, ABMK's focus on visibility throughout its summary judgment response is nonresponsive to the other applicable exclusions. Indeed, ABMK emphasizes that the decay, deterioration, and water infiltration in the roof were hidden and unknown to Saddler and Kandah, but those exclusions are distinct from the "collapse" exclusion and its unique exception.

What is more, in arguing the other excluded causes of loss were hidden and unknown, ABMK several times concedes that those causes of loss occurred—just that they were hidden and unknown. For example, ABMK asserts that evidence from Kandah and Saddler "clearly gave basis for the fact that the compromised structural wood framing—including ridge board and nearby joists that collapsed[—]were both hidden and unknown to [ABMK]." (ECF No. 41, PageID.3215.) That argument acknowledges that the wood framing was compromised, which ABMK's experts all say was the result of repeated water infiltration. *Cf. Headley v. Stillwater Ins. Grp.*, No. 001290-19, 2021 WL 11726560, at *3 (N.J. Super. Ct. Law Div. Nov. 5, 2021) ("Plaintiff argues that the collapse was caused by hidden decay. However, the fatal flaw with Plaintiff's expert report is that [the expert] admits that water penetrated through the concrete of the foundation to cause the rebar to decay. Water was a required catalyst. [The expert] never uses the words 'seepage' or 'flow' . . . [but] states that water, in the form of moisture in the soil, penetrated the concrete."). ABMK similarly contends that "unknown aperture [or] apertures" in the roof allowed "unusually heavy rainfall near the period of the end of April of 2019" to enter the roof

37

before Memorial Day weekend (ECF No. 41, PageID.3200)—again conceding the entry of water more than two weeks before the collapse and also conceding openings in the roof.

Beyond these arguments addressed to exceptions applicable only to the "collapse" provision, ABMK makes short shrift of the other exclusions asserted by Central. Despite the ample evidence that supports wear and tear and decay or deterioration, ABMK lumps each exclusion together under a single heading, quickly dispenses with each, and mischaracterizes the record evidence to do so.

## V. Conclusion

In sum, there is no genuine dispute of material fact that an excluded cause of loss—whether prolonged water seepage, wear and tear, or decay and deterioration—contributed to the roof's collapse. Thus, the loss was not covered by the insurance policy, so Central has not breached the policy by refusing to pay.

For the reasons above, Central Mutual Insurance Company's motion for summary judgment (ECF No. 31) is GRANTED. Because the Court is granting judgment in favor of Central, it DISMISSES AS MOOT Central's motion to strike (ECF No. 48) four affidavits attached to ABMK's response (ECF Nos. 41-4, 41-5, 41-6, 41-8) and its motion to exclude or limit two experts' reports and testimony (ECF Nos. 30, 32). It also STRIKES the untimely and improper expert affidavit at ECF No. 41-4. A separate judgment will issue dismissing the complaint.

IT IS SO ORDERED.

Dated: September 27, 2024

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE